[No. 29698. *En Banc.* February 20, 1947.]

THE CITY OF TACOMA, *Respondent,* v. ROBERT HOUSTON, *Appellant.*[1]

[1]Reported in 177 P. (2d) 886.

*S. J. O'Brien,* for appellant.

*Howard Carothers, Clarence M. Boyle, George F. Abel,* and *Hugo Metzler, Jr.,* for respondent.

STEINERT, J.—By complaint filed in the police court of the city of Tacoma, defendant was charged with the crime of operating a house of prostitution. Upon conviction of that offense, he appealed to the superior court, where he was again convicted in a trial before a jury. From the judgment of conviction and sentence, defendant appealed.

The evidence in the case consists solely of the testimony of five police officers. Appellant, Robert Houston, did not himself testify nor did he offer any other evidence. The facts are therefore to be found in the evidence submitted by the prosecution, as follows:

About three days prior to the events which gave rise to this charge, an army major, accompanied by a negro soldier, made verbal complaint to the Tacoma police department that the soldier had contracted a venereal disease in a certain house within that city. Two policemen, accompanied by the major and the soldier, procured an automobile and drove, as directed by the soldier, to a certain address which was pointed out by the informant as being the place where he had contracted the disease. The house was a residence building then owned and occupied as a home by the appellant, a negro, and proved to be one which had been

under observation by the police for several weeks and which they had raided a number of times before, making arrests and subsequently securing convictions upon charges not disclosed by the record in this case.

About two o'clock in the afternoon of October 22, 1944, which was the Sunday following the day identification was made by the soldier, the same two police officers drove to the place above referred to and, for the purpose of observation, stationed themselves in the alley back of the house, at a point commanding a full view of the premises. During a vigil lasting about two hours, the officers saw as many as twelve or fifteen negro soldiers and sailors, in uniform, entering the house singly or in pairs by way of the alley and, within twenty or thirty minutes thereafter, leaving by the same passage.

The officers thereupon communicated with the police department and requested that a patrol be sent to assist them. On arrival of the patrol, consisting of three policemen, the group of five officers approached the house from the rear, three of them going directly to the back door and the other two proceeding toward the front. All of the policemen were in uniform.

At this time, no warrant for the arrest of the appellant and no search warrant with reference to the house had been issued, and no complaint had been filed against any occupant of the premises.

One of the group of three policemen knocked at the back door, announced that he was a police officer, and demanded admittance. Some one from within drew aside the window shade and, having looked out, opened the door. While one of the officers remained at the door to prevent any escape, the other two immediately entered, going directly into the kitchen, where they found the appellant with another man and two women, all negroes, fully dressed in street attire. At the same time, the officers heard a scurrying in other parts of the house. The officer who was in charge of the group of police proceeded to the front door, opened it, and admitted the two policemen who had approached

that point. One of these two officers remained as guard, at the door, and the other one entered the front room.

A few minutes later, two of the officers proceeded upstairs and, as they reached the hall above, one of them saw a negro woman, stark naked, run from one room to another and close the door. Immediately thereafter the officer heard the sound of money being dropped or thrown upon the floor. Outside the door of the latter room a pair of shoes and socks, of the military type, were lying on the floor. The officers demanded entrance to that room and were admitted by the woman, who was still naked. A small amount of money was seen upon the floor.

The officers then went to the room from which the woman had come and there found a negro soldier lying naked on a bed. Hearing a commotion in the near-by bathroom, the officers proceeded thither and found two soldiers and a sailor, all negroes.

The commanding officer thereupon summoned a station wagon, and, upon its arrival, all the persons who had been found in the house were taken to police headquarters, where they were "booked" as inmates of a house of prostitution. A search of their persons revealed a total sum of $17.50.

On the following day, October 23rd, the city attorney filed in the justice court a criminal complaint charging appellant with the crime of operating a house of prostitution, in violation of the provisions of a municipal ordinance of the city of Tacoma. It is undisputed that the crime with which appellant was charged constitutes merely a misdemeanor, not a felony. Upon that charge he was tried the next day and was found guilty. He thereupon appealed to the superior court.

About three months prior to the day of trial in the superior court, the appellant moved the court to suppress all evidence to be produced through the testimony of the five policemen who had participated in the raid described above. This motion was based on the grounds that appellant's arrest was without warrant or complaint, and there-

fore illegal; that all of the purported evidence to be produced on behalf of the complainant had been procured by police officers without a search warrant, contrary to the provisions of the Federal and state constitutions and the statutes of the state of Washington; and that no offense had been committed in the presence of the officers, and they had no probable cause for arresting him. The motion was denied. At the trial, the motion was renewed but was again denied. Over the objection of the appellant, the evidence was admitted, resulting in his conviction.

Disposing summarily of one of appellant's principal contentions, we will say at the outset that, if the evidence as above set forth was admissible, we hold it to be sufficient to warrant the verdict which the jury returned and the judgment which the court entered thereon.

The crucial question in the case, however, is whether the evidence, obtained in the manner above described, was admissible over appellant's objection; for, if it was not admissible, then there was no evidence to support the conviction.

To answer that question in the affirmative would require a holding (1) that the entry by the officers was lawful, or (2) that, whether lawful or not, the evidence so obtained was nevertheless admissible.

If the entry was lawful, then it was proper for the officers to testify concerning those things that were open and plainly visible to them. *State v. Llewellyn,* 119 Wash. 306, 205 Pac. 394; *State v. Miller,* 121 Wash. 153, 209 Pac. 9; *State v. Nilnch,* 131 Wash. 344, 230 Pac. 129; *State v. Nelson,* 146 Wash. 17, 261 Pac. 796; *State v. Parent,* 156 Wash. 604, 287 Pac. 662.

However, Rem. Rev. Stat., § 2240-1 [P.P.C. § 139-5], provides:

"It shall be unlawful for any policeman or other peace officer to enter and search any private dwelling-house or place of residence without the authority of a search-warrant issued upon a complaint as by law provided."

Rem. Rev. Stat., § 2240-2 [P.P.C. § 139-7], provides that a violation of the foregoing section of the statute constitutes a gross misdemeanor.

Although the house involved in this action may have been one in which prostitution frequently was practiced, it was nevertheless a private dwelling house or place of residence. The officers had no search warrant nor even a warrant of arrest, nor had any criminal complaint against the appellant been filed at that time. In fact, the purpose of the officers was not to make an immediate arrest for a crime that had been, or was then being, committed, but rather for the purpose of searching the premises and obtaining information upon which an arrest might then be made.

It is conceded, and also asserted, by the respondent that there is no statute in this state authorizing the issuance of a search warrant against premises suspected of being used as a house of prostitution or against the person suspected of operating such a house. There are admittedly a number of statutes providing for the issuance of warrants for the search of premises and seizure of intoxicating liquor, stolen goods, counterfeit coin, gaming apparatus, and other contraband articles found therein, but no statute relating to a situation or set of circumstances such as we have here.

Respondent argues that, since the law makes no provision for the issuance of search warrants in cases of this sort, none is required. The conclusion which respondent thus seeks to draw from the stated premise is *non sequitur.* Art. I, § 7, of the state constitution provides that no person shall be disturbed in his private affairs, *or his home invaded,* without authority of law. In the absence of some statute which, under the permissible limits of the constitutional provision, grants such authority, no police officer may lawfully enter a person's home for the purpose of making a search therein, prior to the arrest, or the issuance of a warrant for the arrest, of such person.

Upon the facts shown by the evidence in this case, one skilled in the dialectic art might pose a question as to whether the particular building here involved was a *home* in which prostitution was habitually carried on, or whether it was a *house of prostitution* which its owner also occupied as his home. Whatever distinction may exist between the two conceptions and whatever significance may attach to the one or the other, the constitution forbids the invasion of one's home, and it is not disputed in this case that the place was in structure an ordinary residence building, that it was equipped with the usual furniture and furnishings found in residential property, and that it was actually the home of the appellant, used as such by him.

If, upon the information which the officers had acquired prior to the time of their entry, a formal complaint had been made and a warrant for appellant's arrest had been issued, as provided by Rem. Rev. Stat., § 1925 [P.P.C. § 148-3], and, if upon that authority the officers had entered the building, forcibly or otherwise, pursuant to the provisions of Rem. Rev. Stat., §§ 2082 to 2085 [P.P.C. § 122-5 to 122-13], inclusive, a totally different question would be before us. But that is not the situation with which we are here confronted, for none of those steps were taken. Furthermore, under the provisions of the "red light" abatement law of this state (Rem. Rev. Stat., § 946-1 [P.P.C. § 81-9] *et seq.*), if the officers knew that the place was being used as a house of prostitution or had knowledge of its general reputation, they could readily have supplied the basis for an action "in equity" by the prosecuting attorney or any citizen of the county to have the place declared a nuisance and its operation perpetually enjoined. That, however, would not have been a criminal action such as the one sought here, nor would it have required nor permitted a search warrant, nor would it have justified an entry and search without a warrant of arrest or a warrant to search and seize. In any event, no steps under the authority of that law were taken. Upon the ground of the constitutional and statutory proscriptions, denoted above, we hold that the entry and the search which followed were unlawful.

This brings us to the second, and ultimately decisive, question, namely, whether, despite the fact that the entry was unlawful, the evidence obtained as a result of such entry and consequent search was, nevertheless, admissible. ·

We have frequently held, and are now committed to the rule, that the state or other prosecuting authority may not use, for its own profit, evidence that has been obtained in violation of law. In *State v. Gunkel*, 188 Wash. 528, 63 P. (2d) 376, many of the cases announcing or recognizing that rule are cited.

The opinion in that case also states the equally well-settled rule, as laid down and fully explained in *State v. Dersiy*, 121 Wash. 455, 209 Pac. 837, 215 Pac. 34, that objection to such evidence must be timely made. In the case at bar, it is undisputed that the motion to suppress the evidence was a timely assertion of appellant's rights.

In the case of *State v. Gibbons*, 118 Wash. 171, 203 Pac. 390, one of the questions involved was whether intoxicating liquor seized from an automobile by a sheriff without a search warrant, after its possessor had been unlawfully arrested upon a public street, was admissible in evidence against the possessor. Resting its decision on the constitutional provisions and holding the evidence to be inadmissible, this court said:

"We note that the case before us does not involve a search or seizure of whiskey in the home of appellant; but manifestly the constitutional guaranty that 'no person shall be disturbed in his private affairs, or his home invaded, without authority of law,' protected the person of appellant, and the possession of his automobile and all that was in it, while upon a public street of Ritzville, against arrest and search without authority of a warrant of arrest, or a search warrant, as fully as he would have been so protected had he and his possession been actually inside his own dwelling."

The case at bar presents a more challenging set of facts than did the *Gibbons* case, *supra*, in that here the entry, search and seizure, and subsequent arrest were not made upon the public street, but within appellant's home.

In *State v. Buckley,* 145 Wash. 87, 258 Pac. 1030, which involved a burglary, police officers, without a search warrant, entered the private apartment of a suspect, in much the same way as was done in the present case. After making search of the room and discovering certain articles conforming to the description of the property which had been stolen, the officers seized the articles and placed the occupants of the room under arrest. In affirming an order granting a new trial on the sole ground of erroneous admission of the seized articles in evidence, this court held that "the admission in evidence of the articles found on the search was error, and the trial court, therefore, rightfully granted a new trial." We quote from the decision the following paragraph, showing that the court chose to follow what has been denominated the Federal rule, in preference to the rule which the court at the same time conceded was accepted by the English courts and by the majority of the American appellate courts:

"It is the rule of the English courts, and is the rule of the courts in a majority of the American states, that the admissibility of evidence is not affected by the manner in which, the means by which, or the source from which, it is obtained. It is held that, if the evidence is otherwise pertinent to the issue, it is no valid objection to its admissibility to show that it was unlawfully or illegally obtained. See the note of Mr. Freeman to *State v. Turner,* 82 Kan. 787, 109 Pac. 654, 136 Am. St. 129, 135. The highest court of the land, however, has uniformly followed a contrary rule. It has said, in no uncertain language, that it is beneath the dignity of the state, and contrary to public policy, for the state to use for its own profit evidence that has been obtained in violation of law. *Boyd v. United States,* 116 U. S. 616; *Weeks v. United States,* 232 U. S. 383; *Silverthorne Lumber Co. v. United States,* 251 U. S. 385; *Gouled v. United States,* 255 U. S. 298; *Amos v. United States,* 255 U. S. 313; *Agnello v. United States,* 269 U. S. 20. We have ourselves followed the Federal rule. *State v. Gibbons,* 118 Wash. 171, 203 Pac. 390; *State v. Dersiy,* 121 Wash. 455, 209 Pac. 837; *State v. Smathers,* 121 Wash. 472, 209 Pac. 839."

In *State v. Knudsen,* 154 Wash. 87, 280 Pac. 922, we again stated that we had adopted the rule laid down by the

supreme court of the United States that it is beneath the dignity of the state and contrary to public policy to use evidence obtained in violation of law. We there also stated that, while some of the language in the *Gibbons* case, *supra,* had been subsequently explained and held inapplicable to certain situations presented by later cases, nevertheless the principle of law laid down in that case had never been repudiated by this court.

The cases cited and relied upon by the respondent as calling for a different conclusion are the following: *State v. Basil,* 126 Wash. 155, 217 Pac. 720; *State v. Evans,* 145 Wash. 4, 258 Pac. 845; *State v. Much,* 156 Wash. 403, 287 Pac. 57; *State v. Thomas,* 183 Wash. 643, 49 P. (2d) 28; *State v. McCollum,* 17 Wn. (2d) 85, 136 P. (2d) 165, 141 P. (2d) 613.

In the *Basil* case, *supra,* the defendant was suspected of interfering with conversations held over a local telephone line. Complaint having been made to the sheriff, he, in company with two other officers, went to the place designated, which was the defendant's home, and, as they reached it, they saw the defendant approaching the house from across the street. They followed her to the house, which she entered ahead of them. Looking through the glass in the door, they saw her with two bottles in her hands, apparently making an effort to pour their contents into a stove. The officers then entered the house by simply turning the latch of the door, which was not locked. The defendant thereupon desisted from her immediate efforts, but took the bottles into a pantry and put them in a churn. By that time, the officers had overtaken her and the sheriff took the bottles from the churn and found that they contained intoxicating liquor, whereupon they arrested the defendant and charged her with the offense of unlawful possession of intoxicating liquor. Prior to the time of the trial, the defendant moved that the liquor be suppressed as evidence. The motion was denied, and the evidence was later admitted, over the defendant's objection. Upon de-

fendant's appeal from the judgment of conviction, this court held that the evidence was admissible, saying:

"Conceding that the entry of the officers into the dwelling house was a trespass, it was but that and nothing more. It was not unlawful in the sense that they entered for an unlawful purpose. *They had no purpose to search the dwelling for evidences of crime, nor purpose to commit any other wrongful or unlawful act therein.* The dwelling was not locked against them, nor were they forbidden by the owner to enter. They, therefore, committed no offense against the criminal statutes by entering in the manner they did enter; at most they committed a civil trespass." (Italics ours.)

The language italicized above distinguishes that case from the one at bar. In the instant case, the officers entered the dwelling for the sole purpose of making a search for evidence of crime. More important than that, however, is the fact that the *Basil* case, *supra,* was not affected by Rem. Rev. Stat., § 2240-1, quoted above (making it unlawful for any peace officer to enter and search any private dwelling house or place of residence without the authority of a search warrant issued upon a complaint as by law provided), for at the time of the alleged offense, that statute, although passed by the legislature, had not yet become effective. In the present case, the entry by the officers was not merely a "civil trespass"; it was itself in violation of a criminal statute. The cited case is therefore not controlling here.

In *State v. Evans, supra,* the facts in brief were these: A murder had been committed and soon thereafter the police arrested the defendant who was then on his way from the place where the murder had been committed to his room in a hotel. The police took from defendant's possession an automatic pistol, a watch and chain, and some miscellaneous papers. Later that same evening, the police went to the defendant's hotel room, searched the place, and found a pistol holster which fitted the automatic pistol found on defendant's person. When the holster was offered in evidence at the subsequent trial, the defendant objected to its admission on the ground that it had been

obtained by an unlawful search of the room. The objection was overruled by the trial court on the ground that the defendant had consented to the search. Upon defendant's appeal from a judgment of conviction, this court held that the great weight of the evidence substantiated the finding of the trial court that the search was conducted with the defendant's consent.

Continuing further, by way of dictum however, this court held that, even if the search was made without the defendant's consent, still the search was not unlawful nor the evidence inadmissible. The reason given by the court for its conclusion was that, since the defendant, when arrested, was on his way to his place of abode, that circumstance brought him within the application of the well-settled rule that, where an accused is arrested in his home, or place of residence, a search of such home or place of residence may be lawfully made for evidence of guilt.

Aside from the fact that what the court said with reference to the lawfulness of the search was dictum, that case is distinguishable from this one in at least two respects: (1) there, the search was made *after* the arrest, while here the search was the immediate objective and the arrest was made *after* the evidence had been obtained through the search; (2) in that case, a felony was involved, justifying an arrest by the officers who were in possession of persuasive evidence tending to show that the defendant was guilty of the crime that had been perpetrated, while here only a misdemeanor was involved, the commission of which was not fully known to the officers until after they had made the unlawful entry and search. It is the rule in this state that not even an officer may arrest for a misdemeanor without a warrant, on information or suspicion, unless the misdemeanor was actually committed in his presence. *Mitchell v. Hughes,* 104 Wash. 231, 176 Pac. 26.

The case of *State v. Much, supra,* involved the admissibility in evidence of certain articles which sheriff officers had discovered upon digging in a garden outside the defendant's home, after the defendant had been arrested

upon convincing evidence indicating that he was guilty of the crime of murder in the first degree. Upon the authority of the *Evans* case, *supra,* this court held the evidence admissible. The *Much* case is distinguishable from the one at bar for the same reasons as is the dictum in the *Evans* case.

Without detailing the facts in the *Thomas* and *McCollum* cases, *supra,* it is sufficient to say that, in each of those cases, the search and seizure complained of were incident to a lawful arrest previously made, and both of those cases rest upon the authority of the *Evans* and *Much* cases, *supra.* They are therefore distinguishable from the case now before us.

We bear in mind the fact that, in all of the cases hereinbefore discussed, the evidence sought to be suppressed consisted of physical objects, whereas in this case the evidence sought to be suppressed was the testimony of witnesses concerning facts discovered in pursuance of an unlawful entry and search. The principles underlying the admission of the two kinds of evidence are, in our opinion, the same, in that the admission of either kind involves a transgression of the precept above expressed, that it is beneath the dignity of the state and contrary to public policy to use evidence obtained in violation of law, and both are likewise contrary to the spirit and purpose of Rem. Rev. Stat., § 2240-1. If the evidence adverted to above were admissible, we would have no difficulty in holding that the character of the premises here involved was that of a house of prostitution rather than that of a "home," and as such house of prostitution, the premises would lose the protection of the constitutional provision. The trouble here is, however, that the evidence to establish the unlawful character of the place was, for reasons hereinabove given, inadmissible.

Since the entry was unlawful and the evidence thereby obtained inadmissible, the judgment of conviction is without legal support and is therefore reversed, with direction to dismiss the complaint.

ROBINSON, SIMPSON, SCHWELLENBACH, ABEL, and HILL, JJ., concur.

MILLARD, J., concurs in the result.

MALLERY, C. J. (dissenting)—I quote from the majority opinion:

"If the evidence adverted to above were admissible, we would have no difficulty in holding that the character of the premises here involved was that of a house of prostitution rather than that of a 'home,' and, as such house of prostitution, the premises would lose the protection of the constitutional provision. The trouble here is, however, that the evidence to establish the unlawful character of the place was, for reasons hereinabove given, inadmissible."

With this latter conclusion I do not agree. The hearing upon the motion to suppress is a proceeding distinct and apart from the trial of the case. The evidence adduced upon such a hearing in the absence of the jury is considered by the court to determine whether the evidence should be suppressed or admitted at the trial. If from a consideration of all of the evidence so adduced the court determines that the place in question is a house of prostitution, then it follows that it cannot be a home, for those entities are mutually exclusive of each other, and the evidence should not be suppressed. The donning of sheep's clothing does not convert a wolf into a sheep, and I know of no reason why a court is required to find legal conclusions that are inconsistent with the actual facts.

I am apprehensive about the effects which may flow from this decision. If houses of prostitution are to enjoy the immunities intended only for homes, law enforcing procedures may be unable to reach them.

This case itself illustrates the situation. If the results of the inspection by the officers were available as evidence, a conviction could be sustained, but, since they are held not to be available, the conviction cannot be sustained. Well-founded suspicions, conjecture and surmise do not meet the burden of proof imposed upon the state in criminal cases. Experience has amply demonstrated that customer

experience as a source of testimonial knowledge to be used as evidence upon a trial is also never available in such cases. The customers refuse to testify, and certainly the state cannot expect its law enforcing officers to gain the necessary testimonial knowledge by customer experience in houses of prostitution. Law enforcement in such cases must be based upon inspections. A house of prostitution is a commercial enterprise and should be subject to inspection just as any other commercial enterprise concerning which police regulations have been promulgated. I cannot distinguish between the legal basis for a sanitary inspector's examination of a restaurant and a police inspection of a house of prostitution.

I dissent.

JEFFERS, J. (dissenting)—I am in accord with the result reached by Judge Mallery in his dissent.

'Reported in 177 P. (2d) 711.